Filed 10/13/23  P. v. Duangputra CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PRINYA DUANGPUTRA,<br><br>    Defendant and Appellant. | H048637<br>(Santa Clara County<br> Super. Ct. No. C1640560) |

Appellant Prinya Duangputra was convicted by a jury of multiple counts of committing lewd and lascivious acts on a child by force under the age of 14 (former Pen. Code, § 288, subd. (b))[1] and forcible oral copulation with a child under the age of 14 (former § 288a, subd. (c)) against his two cousins, An.D. and Ar.D.  On appeal, Duangputra argues that the trial court erred by excluding evidence that An.D. and Ar.D. had a motive to fabricate their allegations, that CALCRIM No. 1193 erroneously informed the jury that it could consider expert testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS) to determine An.D.'s and Ar.D.'s credibility, and that the cumulative effect of these two errors warrants reversal of his convictions. Duangputra further argues that the imposition of consecutive sentences under section

---

[1] Unspecified statutory references are to the Penal Code.

667.6 without a finding by the jury that the offenses were committed against the same victims on separate occasions violated his right to a jury trial, he is entitled to resentencing under section 1170 as amended by Assembly Bill No. 124 (2021-2022 Reg. Sess.), and his fines and fees should be stayed because there was no finding that he had the ability to pay them. We reject his claims of trial error, but we find merit in his contention that he is entitled to resentencing under Assembly Bill No. 124. We reverse and remand the matter for sole purpose of resentencing.

## I.    BACKGROUND

The Santa Clara County District Attorney charged Duangputra in the operative amended information with 10 counts of lewd or lascivious acts on a child under the age of 14 by force, violence, duress, menace, or fear (former § 288, subd. (b); counts 1-2, 5-8, 11-14) and five counts of oral copulation on a child under 14 years old by force, violence, duress, menace, or fear (former § 288a, subd. (c); counts 3, 4, 9, 10, 15). Counts 1 through 6 were alleged to have been committed against victim An.D. between January 1, 1989, and July 26, 1991. Counts 7 through 15 were alleged to have been committed against victim Ar.D. between January 1, 1989, and July 26, 1991.[2]

### A.    *The Prosecution's Case*

#### 1.    *Abuse of An.D. (Counts 1-6)*

An.D. (born 1980) is Duangputra's younger cousin. Duangputra is the son of An.D.'s maternal aunt. An.D. has two brothers, a younger brother, P.P., born in 1985, and an older brother, Ar.D., born in 1979. An.D. estimated that Duangputra touched him

---

[2] As to all counts, it was alleged that the applicable statute of limitations had expired but that the statute of limitations had been tolled or extended under section 803, subdivision (f), as the crimes involved substantial sexual conduct as described in section 1203.066, subdivision (b) that was not mutual, and there was independent evidence that clearly and convincingly corroborated the victims' allegations.

inappropriately when he was between eight and 10 years old.[3] At the time, An.D. lived in San Jose with his family, including his two brothers, his mother L.P., his father S.P., his uncle S.C., and Duangputra. The house was a three-bedroom house; An.D., Ar.D., and P.P. shared a bedroom, S.C. had the other bedroom, and L.P. and S.P. had the master bedroom. Duangputra did not stay in a bedroom and instead slept in a "[n]ook" area near the dining area and kitchen that was separated with a divider or makeshift wall.

At the time, An.D.'s father worked as a machinist and owned a liquor store. His mother and S.C. worked at a factory that made electronic hardware. An.D. could not recall how often S.C. worked, but his parents often worked from morning until after An.D. and his siblings went to sleep. Duangputra babysat An.D. and his siblings when his parents worked. An.D. and Ar.D. attended an elementary school across the street from the house, and usually either S.C., L.P.'s younger sister, or Duangputra would be home when they got back from school. An.D. recalled that his parents were usually not at home when he got back from school.

An.D. feared Duangputra when he was younger. Duangputra would force An.D. and Ar.D. to eat large portions of food and would cut An.D.'s fingernails and toenails until they bled. Duangputra would also crack An.D.'s and Ar.D.'s knuckles.

An.D. estimated that Duangputra touched him inappropriately approximately five to 10 times.[4] Most of the incidents involved Duangputra grabbing An.D. and taking him

---

[3] An.D. acknowledged that in prior statements, he said that Duangputra abused him only when he was 10 years old. An.D., however, based his earlier estimate on information from his mother that Duangputra had lived with them in 1990. After further reflection, An.D. now believed that Duangputra touched him inappropriately when he was 10, but the incidents also started earlier than that. And the first time An.D. testified in a hearing related to this case, he said that the incidents happened when he was between seven and 10 years old.

[4] In prior statements, An.D. said that Duangputra touched him inappropriately four times.

into a room where An.D. was forced to masturbate Duangputra. An.D. recalled that the first time Duangputra touched him, he told An.D. that they were going to play a game and pulled him into either the bathroom or bedroom. Duangputra pulled his pants down, revealing an erection. Duangputra then guided An.D.'s hand onto his penis and made An.D. stroke him until he ejaculated over An.D. Duangputra often made An.D. "cup [his] hands" so that he could catch Duangputra's semen. Afterwards, Duangputra would take An.D. to the bathroom to wash his hands. These incidents occurred sporadically, and there was no fixed pattern to their occurrence. Duangputra would tell An.D. that this was their "secret" and their "game" and not to tell anyone else about what happened.

An.D. recalled that one time, Duangputra pulled him into the master bedroom and made An.D. orally copulate him. An.D. told Duangputra that he did not like what he was doing and wanted to stop, but Duangputra put on a condom and put his penis back inside An.D.'s mouth. After a while, Duangputra took off the condom and made An.D. stroke his penis until he ejaculated.

Duangputra was always alone in a room with An.D. when he touched him inappropriately, but Ar.D. would often be in the house and would be "out there playing or watching TV." Usually, Duangputra would grab either An.D. or Ar.D. and pull one of them into a room with him. If Duangputra caught Ar.D., Ar.D. would appear upset and cry. One time, An.D. saw Ar.D. emerge from the bedroom after he was pulled aside by Duangputra, and it looked like Ar.D.'s hands were cupped with semen.

Duangputra stopped touching An.D. inappropriately when An.D.'s family moved from San Jose to Rohnert Park. An.D. estimated that the family moved to Rohnert Park in 1991, when he was around 10 years old.[5] But since both Duangputra and An.D.

---

[5] P.P. testified that he started kindergarten in Rohnert Park around August or September 1990, but that he moved with his parents first while his two older brothers stayed in San Jose.

4

worked at some of the businesses owned by An.D.'s parents, including a Thai restaurant and a gas station., An.D. would still occasionally have contact with Duangputra. When An.D. saw Duangputra, he would try to leave or avoid him. An.D. never confronted Duangputra about his actions.

### 2. *Abuse of Ar.D. (Counts 7-15)*

Ar.D. estimated that Duangputra touched him inappropriately "[m]any times," starting when he was in fourth, fifth, or sixth grade.[6] The incidents always occurred in the family's home in San Jose. Ar.D. recalled that he lived in the house with his parents, An.D., their younger brother P.P., S.C., and Duangputra. Ar.D. did not remember his parents being home during the evenings because they were always working, and he saw L.P. only once a week. Duangputra was home when Ar.D. and An.D. got back from school and would be home alone with them during the evenings.

The incidents spanned more than two years and happened frequently—approximately every night or every other day, or more than "[s]everal hundred times." Duangputra made it seem like a game—he would lay down on the couch and tell Ar.D. and An.D. to "push this button," meaning his penis. Eventually, the incidents progressed to "other things"—in the nook area, Duangputra would pin Ar.D. down on his belly and rub his penis between Ar.D.'s buttocks. Ar.D. estimated that these incidents occurred more than 10 times. Sometimes Duangputra used a condom, and the condom would break and pop. Duangputra would whisper to Ar.D. that he should not fight it and that he could tell that Ar.D. was enjoying it. Duangputra never sexually penetrated him.

Duangputra also made Ar.D. orally copulate him. Duangputra directed Ar.D. on how to move his tongue and would either ejaculate into Ar.D.'s mouth or onto his hand. He would also have Ar.D. cup his hands together to catch the semen. Ar.D. also recalled

---

[6] Ar.D. had previously told an officer that he thought Duangputra first touched him when he was approximately 11 years old, starting in 1990.

that Duangputra orally copulated him once to show Ar.D. what to do. During that incident, Ar.D. looked out the window and saw that An.D. was standing outside looking in his direction. Duangputra also had Ar.D. stroke his penis. Ar.D. also testified that Duangputra had tried to kiss him on the mouth, a fact that he did not mention when he first disclosed the abuse in 2016.

Ar.D. could not recall if he tried to get Duangputra to stop, but he remembered that he told Duangputra he did not want to be touched inappropriately. Ar.D. knew that Duangputra had also molested his brother An.D. because An.D. would cry when being touched. More than once, Ar.D. saw An.D. come out of the nook area with what he assumed was semen in his hands.

As a child, Ar.D. was scared of Duangputra, who bullied him.

### 3. *Disclosure of the Abuse*

After An.D. married in 2011, his wife noticed that he always left when he saw Duangputra at family events. In 2011 or 2012, An.D. told his wife that he wished Duangputra were dead and explained what had happened. An.D.'s wife testified that before they married, her husband told her generally that he had been molested. After they married, she noticed that An.D. always left when he saw Duangputra at family events. Over the next few years, An.D. told her a few specific details, including that the abuse took place in the family's house.

In May 2015, An.D.'s father died. When An.D. got to the hospital, he saw Duangputra was present among the family members, which upset him. An.D. told Ar.D. that he wanted Duangputra to leave. At that moment, Ar.D. understood why An.D. "just kind of lost it," so Ar.D. asked Duangputra to leave. Duangputra left without questioning why.

A short while later, An.D. told his younger brother P.P. and P.P.'s wife about Duangputra's abuse, but he spoke only generally about what happened and did not provide specifics.

6

An.D. went to the police in May 2016, at his wife's urging. An.D. only told his wife and his mother L.P. that he was going to go to the police; he did not mention his decision to Ar.D. When officers asked him for Ar.D.'s contact information, An.D. called Ar.D. to tell him that he knew that Ar.D. had also been molested by Duangputra. Ar.D. seemed upset after An.D.'s call; before this conversation, An.D. and Ar.D. had never discussed being abused by Duangputra.

It was on contact by officers responding to An.D.'s report that Ar.D. first disclosed the abuse. Ar.D. was angry about being contacted by police; he just wanted to live his life and try to forget about what had happened.

After reporting Duangputra to the police, An.D.'s relations with his family became strained. One of An.D.'s uncles discouraged him from pursuing his allegations. L.P., though living in An.D.'s home, avoided eye contact with him after her testimony in a prior hearing, and other relatives with whom he had once been close became cold towards him. Ar.D. experienced similar resistance from several family members—an uncle, his aunts, and his mother—who discouraged him from speaking about the abuse.

### 4. *CSAAS*

Dr. Blake Carmichael, a clinical psychologist, testified as an expert in CSAAS— "a framework for understanding why [sexually abused] kids may or may not do certain things you expect."

Carmichael testified that the first component of CSAAS is secrecy, which perpetrators cultivate by methods ranging from aggression to reliance on a preexisting relationship with the child.

The second CSAAS component Carmichael described is helplessness—the inability or reluctance of children to physically resist a perpetrator who is typically stronger, older, and in a position of authority over the child.

Carmichael characterized the third element of CSAAS as entrapment or accommodation, whereby children may feel trapped in a sexual relationship and resort to

tactics like pretending they are asleep, making themselves less accessible to the perpetrator, or disassociating.

Carmichael testified that CSAAS's fourth element is delayed, conflicted, or unconvincing disclosure. According to Carmichael, most children do not report abuse right away, and when a victim has repeatedly been abused, it may become difficult to think about each discrete incident independently and recall them with accuracy. Carmichael opined that generally, it is more difficult for boys to disclose sexual abuse than girls.

According to Carmichael, the fifth element of CSAAS involves retraction or recanting by a child victim who, having reported abuse, decides to instead claim that it never occurred.

**B.** *The Defense*

The defense theory of the case was that An.D. and Ar.D. had fabricated their allegations out of jealousy of their mother L.P.'s affection for Duangputra.[7]

At trial, L.P. testified for the defense. L.P. was born in Thailand. Although Duangputra was her nephew, L.P. also considered him to be like a son. L.P. took care of

---

[7] Based on testimony by An.D. and Ar.D. that they seldom saw their parents, who typically worked at all hours, defense counsel argued in closing that the two brothers "over the decades . . . came to believe their own [parental] abandonment story. Somewhere along the way, they began to feel they didn't get enough love and attention from mom and dad . . . ." In contrast, Duangputra was "loved by their parents" and that L.P. "loved and treated [Duangputra] like a son." Accordingly, "by [their father's death], they hated [Duangputra.] Rational or irrational, [Duangputra] was encroaching on their family. He was insinuating himself." "This abandonment narrative that they've come to believe and accept and hold as their truth was not supported by the other witnesses." "And in this false-abandonment story, this, this memory, this belief, this is the backbone of their entire allegation against the defendant. If it's not true, then what they described could not have happened to them at the hands of the defendant the way they described that it did."

8

Duangputra from when he was around one or two years old until he was approximately eight years old.

In 1978, L.P. emigrated from Thailand to San Jose, where she and her husband, S.P., came to own two houses. The couple and their children occupied the master bedroom of one of the San Jose houses, which they shared with S.C. and his wife. In 1985 or 1986 after P.P. was born, L.P., S.P., and their three children moved to a condominium in San Jose.

Duangputra then moved into the San Jose house, which he shared with "many people" including, among others, S.P.'s children from a prior marriage, S.C. and his wife, and L.P.'s younger sister.

Ar.D. and An.D. attended the elementary school across the street from the San Jose house where Duangputra now lived. If S.P. was available after school, he would pick up the children. If S.P. was unavailable, either S.C., S.C.'s wife, or L.P.'s younger sister would go pick up the children. S.C. would watch the siblings at the San Jose house for about two hours. Afterwards, L.P. would take the children to the condominium complex because it had a swimming pool.

L.P. testified that she never left Ar.D. and An.D. alone with Duangputra, but she acknowledged having previously told a defense investigator that Duangputra would watch An.D. and Ar.D. once or twice a week. Duangputra moved out of the San Jose house around the same time that L.P. and her family moved to Rohnert Park. As adults, L.P. saw Ar.D. and An.D. interact with Duangputra without apparent issues.

When S.P. died in May 2015, L.P. recalled that Duangputra and her sons were with her at the hospital, and she did not recall anyone speaking to Duangputra or him leaving. At the time, her attention was on her husband.

## C.    *The Verdict and Sentence*

The jury found Duangputra guilty on all counts as charged. Eight months later, the trial court sentenced Duangputra to an aggregate term of 90 years in prison—the six-

9

year middle term for each of the 15 counts of conviction, to be served consecutively pursuant to section 667.6, subdivision (d).

## II. DISCUSSION

### A. *Exclusion of Evidence that An.D. and Ar.D. Had a Motive to Fabricate*

Following an Evidence Code section 402 hearing (402 hearing), the trial court excluded evidence that L.P. had told family members, including An.D., Ar.D., and Duangputra, that she intended to share money if she ever sold her property or "anything else" that she owned. Duangputra argues that the trial court prejudicially erred by excluding the evidence, as it was relevant to support the defense theory that Ar.D. and An.D. fabricated their allegations against him.

#### 1. *Additional Background*

Construing the prosecution motion as seeking "to preclude any argument . . . that victims are making up the false charges . . . to preclude the defendant from receiving any money or other benefit from the estate of the deceased father of the victims," the trial court precluded the defense from asking An.D. and Ar.D.—absent evidence as to the value of the family estate— whether they were influenced by a financial motive. The trial court reasoned that "there has to be something in the estate. And if the estate is negative, then . . . arguing that there was a financial motive is not justified . . . because it would be irrelevant to argue that somebody would be . . . influenced . . . to lie or fabricate a story if there's nothing there."

The defense later modified its initial theory that S.P.'s probate estate was the impetus behind false allegations and made a different offer of proof, based upon a four-day-old interview of L.P. Under the new variant, An.D. and particularly Ar.D. had designs on L.P.'s separate property, and the defense proffered that L.P. "personally gave [Ar.D.] the access and/or control over her [own] money. She can testify that she gave [Ar.D.] access to her living will or trust. She will testify that [Ar.D.] has been trying to control what she does with her money. She will testify that he knew that she wanted to

10

give money to [Duangputra] and other uncles, and that he decided not to give—he decided that she shouldn't give the money to them, and since he had control over it, he decided not to give that money to [Duangputra] and other uncles." L.P.'s testimony would establish that Ar.D. and An.D. "have insinuated themselves in [L.P.'s] properties" and "made it difficult for [her] to have full and sole control" of her money. Specifically, L.P. "can't access her money" because "she doesn't know how" and "has no access without going through [Ar.D.] and/or [An.D.]" The defense maintained that the two brothers are "threatened by . . . defendant's relationship with [S.P. and L.P.], and . . . believe that [L.P.] will give them financial benefit; so they attempt to isolate her, attempt to control her money, and attempt to get [Duangputra] out of the picture." Defense counsel further proffered that Ar.D. and An.D. are "greedy" and "doing everything they can to make sure that [L.P.] doesn't share. There's a lot of money. She'll tell us that. There's a lot of money."

The trial court noted that "some of what [defense counsel] said is contradicted by the [defense investigator's] report" of L.P.'s interview. The prosecution noted other conflicts between counsel's characterization of the interview report and the offer of proof. The defense accordingly called L.P. to testify in a section 402 hearing outside the presence of the jury as to foundational questions raised during argument. The trial court warned, however, "I just want you to understand that even if she has personal knowledge of these things, the fact that they're coming up now is a problem for me."

At the 402 hearing, L.P.'s testimony (through a Thai interpreter) was less comprehensive than defense counsel had anticipated. L.P. testified that after her husband died, certain residential real properties became her sole property,[8] one of which included

_____

[8] We infer from L.P's testimony that the community's residential real property became wholly hers without the need for probate administration as a consequence of S.P.'s intestacy and the joint operation of Probate Code sections 100, 6400 and 13650 et seq.

11

a townhouse that she sold in 2015, after Ar.D. had managed its renovation. Defense counsel never asked L.P. how much she believed these real properties were collectively worth, but L.P. estimated that her profit from the sale of the one townhouse was approximately $300,000. According to L.P., shortly after S.P. died, she said in the presence of multiple family members—including S.C., Ar.D., An.D., P.P., her "in-laws," and Duangputra—that "[i]f I have sold the store or anything else, I will divide the money." L.P. testified that it was not her intention to distribute the money in equal shares among the relatives: "It depends on what I get and share to some extent." But L.P. believed that Ar.D. and An.D. "did not agree" to her dividing the money.

L.P. believed it had also been S.P.'s wish that his money be divided upon his death. Because S.P. died without a will, however, L.P. presumed that family businesses, which then consisted of two gas stations titled in his sole name, would ultimately be divided between only herself, An.D., Ar.D., P.P., and S.P.'s two children from his first marriage, not Duangputra. The family "voted for [Ar.D.] to take care of" the businesses. Although L.P. was not sure how much debt the businesses carried, she initially testified that she believed it was more than $300,000 but not $2 million or "even close to a million." Later, however, L.P. denied that the businesses were in debt, explaining that she "bought [one gas station] with [her] 401(k) money." When asked if it would be accurate to say that S.P.'s estate was $1 million or $2 million in debt, L.P. testified, "For the business alone, that's not correct, but if that [debt calculation] includes the house, yes. But not two million."

At no point did L.P. testify that either Ar.D. or An.D. controlled or attempted to control the sale of the community properties that became her sole property on S.P.'s death, or otherwise obstructed her access to the property or proceeds of sale. At no point did L.P. quantify the value of her own property, other than the proceeds of the sale of one of four real properties. L.P. likewise did not substantiate that Duangputra had any potential claim on S.P.'s estate.

12

At the conclusion of L.P.'s testimony, defense counsel argued for its admission to support the theory that An.D. and Ar.D. fabricated the allegations of abuse believing that "if they accused one of [L.P.'s] close nephews, who she thinks of as a son, of molesting . . . her other sons, it's reasonable that she wouldn't want to share anything with [Duangputra] after that . . . ." Counsel added: "[I]t would be a violation of due process and all federal and state constitutional provisions about due process if the judge does not allow me to argue this. It would affect my client's right to have a fair defense."

The trial court ruled that "all this evidence you've put in here is inadmissible" The trial court reasoned that, without evidence of "how much money was being thought about by either [L.P.] or by [An.D.] and/or [Ar.D.] that was to be given to the defendant," the defense theory required the jury "to speculate that whatever that amount was, . . . it would have been enough" to motivate An.D. and Ar.D. to lie. The court also concluded that it was "total speculation to argue to the jury that An.D. and Ar.D. could prevent [L.P.] from giving away money that she chose to give." The trial court also concluded that the probative value of the evidence would be substantially outweighed by the potential for confusing the jury and for consuming an undue amount of time.

Defense counsel protested that she "just presented an explanation for why they would lie[,] and the Court is not allowing me to present it at all." The trial court attempted to clarify its ruling: "What I'm saying is that this evidence that you have presented through [L.P.], . . . does not support the claim that it gives [Ar.D.] and [An.D.] a reason to lie, because it's speculative . . . ." Defense counsel argued, "But you are telling me that I can't elicit any evidence about money and financial motive to lie, and I can't argue that." The court again attempted to clarify: "No, . . . I'm saying that the evidence that you've presented here through [L.P.] is not sufficient. There's a lot of it that's unfounded."

Thereafter, defense counsel asked the trial court to clarify whether it would "allow me to ask any of these questions of the other witnesses." But defense counsel did not

specify whether she was referring to An.D. and Ar.D. or to their brother, P.P., and maternal uncle, S.C. (or some combination), all of whom had by that point concluded their testimony. The trial court confirmed: "I'm not going to permit you to call witnesses back to . . . now ask them questions about wasn't there money, . . . because you have said on a number of occasions that you're not concerned about the stuff in the estate. You're not concerned about the businesses in the estate. You're only concerned about the property that's [L.P.'s], right?" The trial court reiterated that defense counsel had not been "concerned with anything other than, basically, the sale of [the townhouse in 2015], because you're not concerned about the business properties, because that's a separate kettle of fish." Defense counsel agreed with this characterization, stating that she had "decided it wasn't worth it to get into the probate issue," and that based on L.P.'s most recent testimony, counsel now realized that there were two separate financial issues—the businesses that were in probate to be "shared by six people," and "this chunk that [L.P.] inherited, on her own." Defense counsel continued to argue, to no avail, that the latter issue—L.P.'s separate property—was "enough to be able to get into this and establish motive."

### 2.     *Legal Principles and Standard of Review*

All relevant evidence is admissible except as otherwise provided by statute. (Evid. Code, § 351.) Relevant evidence includes evidence that may impugn a witness's credibility, such as "bias, interest, or other motive" for testifying untruthfully. (Evid. Code, § 780, subd. (f); see *People v. Harrison* (2005) 35 Cal.4th 208, 229.) But Evidence Code section 780 "does not require that all questions relating to a witness' credibility be allowed on cross-examination, nor does it mandate the admission of all evidence offered to show a motive to fabricate. [Citation.] . . . Moreover, evidence of such a motive need not be admitted where the theory behind the alleged motive to fabricate is highly tenuous, speculative, conjectural, or based on 'possibilities.' " (*People v. Johnson* (1984) 159 Cal.App.3d 163, 168 (*Johnson*).)

14

The Sixth Amendment to the United States Constitution further guarantees a criminal defendant the right to confront adverse witnesses. Its main purpose " ' "is to secure for the opponent the opportunity of cross-examination." ' " (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678 (*Van Arsdall*), italics omitted; see also *Doe v. Alaska* (1974) 415 U.S. 308, 316 ["[w]e have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination"].)

But "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination." (*Van Arsdall*, *supra*, 475 U.S. at p. 679.) Thus, "notwithstanding the confrontation clause, a trial court may restrict cross-examination of an adverse witness on the grounds stated in Evidence Code section 352." (*People v. Quartermain* (1997) 16 Cal.4th 600, 624.) "A trial court's limitation on cross-examination pertaining to the credibility of a witness does not violate the confrontation clause unless a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted." (*Id.* at pp. 623-624.)

Under Evidence Code section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "Evidence is not prejudicial, as that term is used in [the Evidence Code] section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence. The code speaks in terms of *undue* prejudice." (*People v. Doolin* (2009) 45 Cal.4th 390, 438-439.) Evidence is unduly prejudicial when "it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction." (*Id.* at p. 439.)

" '[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the relative probativeness and prejudice of the evidence in question.' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.)

### 3. *Analysis*

Duangputra argues that the trial court erred by excluding evidence of a possible financial motive for An.D. and Ar.D. to fabricate their allegations. However, not all relevant evidence is admissible—relevant evidence remains subject to exclusion if its probative value is substantially outweighed by its potential for prejudice under Evidence Code section 352, which the trial court found applicable here. Given the limited probative value of the proffered evidence and the arguments advanced in the trial court and on appeal, we discern no abuse of discretion in the trial court's order excluding the identifiable evidence.

### a. *Preservation of the Confrontation Claim*

Preliminarily, we note the distinction between Duangputra's right to cross-examine Ar.D. and An.D. about their potential motive to lie, on the one hand, and his right to present extrinsic evidence substantiating such a motive, on the other. (See *People v. Castaneda-Prado* (2023) 94 Cal.App.5th 1260, 1280, citing *United States v. Abel* (1984) 469 U.S. 45, 52 [distinguishing cross-examination on bias from extrinsic evidence of bias].) For the first, we note that the defense had no obligation to prove the objective reasonableness of any potential financial motive: defense counsel's good faith basis for the line of inquiry would have sufficed. (See, e.g., *People v. Pearson* (2013) 56 Cal.4th 393, 434 ["The proponent of the impeachment evidence must have a good faith basis for asking the question."]; see also 3 Witkin, Cal. Evidence (6th ed.) Presentation at Trial, § 290, citing *People v. Fatone* (1985) 165 Cal.App.3d 1164, 1174.)

This distinction, however, is one that Duangputra never articulated in the trial court. At the inception of argument on the prosecution's in limine motion, the defense

16

limited its offer of proof to the unspecified actual value of the probate estate.[9]  As the trial progressed, the defense shifted its offer of proof to L.P.'s testimony about the sale of her townhouse and the division of money potentially to be realized from her other unspecified properties, as defense counsel herself conceded at trial that she did not want to get into issues of probate administration.  And at the conclusion of argument at the 402 hearing, defense counsel framed the issue in terms of Duangputra's right to present a defense via L.P., and not his right of confrontation.

Throughout, the defense's consistent focus was on extrinsic evidence—from family members other than An.D. or Ar.D.—of bias and the existence of an objectively quantifiable financial motive.  Consistent with this focus, defense counsel undertook little examination of Ar.D. or An.D. as to potential sources of bias, largely limiting impeachment to inconsistencies in their prior testimony and statements to police.

Although the primary defense at trial was that An.D. and Ar.D. had falsely accused Duangputra out of jealousy relating to their mother's familial and financial favor,[10] defense counsel chose not to question An.D. or Ar.D. about whether they subjectively anticipated any benefit from their allegations.  An.D.—when asked by the prosecutor if he "[stood] to gain anything at all from bringing these allegations forward"—testified that he did not; when asked "what [he] hope[d] to achieve," An.D. began to say "I want –" to which the defense objected.  The defense moved to strike only An.D.'s "I want –" answer.  Counsel neither moved to strike his earlier denial of any

---

[9] Although the trial court's initial ruling was to preclude examination on the subject of the probate estate absent "evidence of the value of the estate," defense counsel made no confrontation objection and expressly abandoned the theory that the probate estate provided evidence of bias.

[10] Defense counsel argued both theories of jealousy were intertwined:  "The jealousy and the money go hand in hand. . . . [¶] . . . [¶]  If they're jealous of him, they don't want him to benefit.  They are the sons."  "All the other stuff about jealousy and the closeness of the families.  That goes hand in hand for me with the financial motivation."

17

anticipated benefit from his testimony nor sought to test that denial either on cross-examination before the jury or in the 402 hearing at which the trial court later heard and ruled on the admissibility of L.P.'s testimony. The defense further elected to abstain from cross-examining An.D. or Ar.D. about their relationship with L.P. or about their subjective feelings on L.P.'s relationship with Duangputra. At most, defense counsel asked An.D. if he knew his mother had helped take care of Duangputra when Duangputra was a child, and whether An.D. knew Duangputra to have spent time with L.P. and S.P. In fact, when the prosecution asked An.D. whether his allegations had "affected [his] relationship with his family at all," defense counsel objected on relevance grounds.

Given the defense's evident reluctance to confront An.D. or Ar.D. on these points, we construe the record as reflecting counsel's tactical choice to forego such cross-examination—and waive any constitutional confrontation claim—potentially out of concern for how An.D. and Ar.D. might answer. (See *People v. Fatone*, *supra*, 165 Cal.App.3d at p. 1174 [suggestion that "counsel should never ask a question without knowing the answer in advance . . . is a tactical restriction, not a legal one by any means"].) But whatever the underlying reason for defense counsel's limited objections in the trial court and her exclusive pursuit of extrinsic evidence of financial motive, Duangputra did not preserve a confrontation claim for appeal by a timely and specific objection on confrontation grounds. (See Evid. Code, § 353 [objection must be timely and specific]; see also *People v. Catlin* (2001) 26 Cal.4th 81, 138, fn. 14 [failure to object on confrontation clause grounds forfeits claim on appeal]; *People v. Waidla* (2000) 22 Cal.4th 690, 726, fn. 8 [specific and timely objection under confrontation clause grounds required to preserve claim on appeal].)

Even assuming counsel's arguments in the trial court could be said to have stated a confrontation claim, Duangputra on appeal asserts only in passing—without reasoned analysis or support—that the trial court's exclusion of L.P.'s testimony violated his right to confrontation. Duangputra does not specifically characterize the issue that he now

18

raises as one involving the scope of his examination of An.D. and Ar.D. Instead, as in the trial court, Duangputra frames his argument principally as one of extrinsic impeachment evidence—"[t]he exclusion of relevant evidence" from L.P.—rather than an infringement of his right to cross-examine An.D. or Ar.D. for bias. And in so doing, Duangputra does not provide citations to supporting legal authority or articulate what legal principles apply to an analysis of a confrontation claim under the Sixth Amendment. Accordingly, on appeal as in the trial court, we construe Duangputra's brief as "an abandonment of [the confrontation] issue." (See, e.g., *People ex rel. 20th Century Ins. Co. v. Building Permit Consultants, Inc.* (2000) 86 Cal.App.4th 280, 284.) Even if this were not his intention, "[w]e are not bound to develop appellant['s] arguments for [him.]" (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.) "To the extent defendant perfunctorily asserts . . . claims, without development and, indeed, without a clear indication that they are intended to be discrete contentions, they are not properly made, and are rejected on that basis." (*People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2.)

### b. *Exclusion of Evidence and Right to Present a Defense*

As to Duangputra's claim that the trial court denied his right to present a defense by excluding the testimony he presented at the 402 hearing, we discern no abuse of discretion. To be sure, evidence that Ar.D. and An.D. stood to benefit financially from their allegations would be relevant to their credibility. To the extent, however, any financial benefit would be contingent upon L.P.'s unilateral preferences and decisions as to her separate property and the competing claims of other family members, the trial court found that the factual basis for the defense theory was based on inferences that were borderline speculative. With no meaningful evidence of either L.P.'s net worth or how much An.D. or Ar.D. likely would believe they stood to gain by eliminating Duangputra as a rival for L.P.'s largesse, we are unable to say the trial court abused its discretion in excluding L.P.'s testimony as insufficiently probative. (See *People v. Bohana* (2000) 84

19

Cal.App.4th 360, 369 [reasonable inference " ' "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work" ' "].)

At the 402 hearing, L.P. confirmed only that she said in the presence of multiple relatives—S.C., Ar.D., An.D., P.P., unspecified "in-laws," and Duangputra—that *if* she sold what was now her separate property she would "divide the money." L.P. made clear in her testimony that any division of such sale proceeds would not be in equal shares, and she left unclear whether she had expressly identified Duangputra among those who would receive a share. L.P. was also not asked about the value of any of the other separate properties she had, and there was no other information in the record about how much the properties were worth or whether and to what extent the properties were encumbered. In fact, during the hearing, L.P., disputing defense counsel's attempt to solicit her agreement that the businesses in the probate estate were $1 million or $2 million in debt, volunteered that there might be significant debt if the estate "include[d] the house." L.P. never specified which "house" was so encumbered, but the trial court could legitimately construe her testimony as suggesting that the residential properties she alone inherited were subject to significant obligations. L.P. also testified that Ar.D. was in charge of the businesses associated with S.P.'s estate, as well as the associated probate case, further undercutting the defense's theory of a financial motive.

In sum, the evidence that the victims were financially motivated to fabricate their allegations stemmed from L.P.'s equivocal statement that she intended to divide proceeds from the sale (and hypothetical future sales) of her separate property among multiple relatives, including not only An.D., Ar.D., and Duangputra, but S.C. and her "in-laws." From this, the defense posits that the An.D. and Ar.D. may have believed that conjuring allegations of sexual abuse against Duangputra would benefit them financially. This motive to fabricate is "highly tenuous." (*Johnson*, *supra*, 159 Cal.App.3d at p. 168.) As defense counsel herself acknowledged, L.P.'s testimony about the status of her own holdings and her late husband's estate was difficult to follow, and L.P. stopped

20

significantly short of substantiating the defense offer of proof. Nor did L.P. substantiate defense counsel's claim that An.D. or Ar.D. had exerted any control or efforts to control her access to her own money or her decisions on how to spend it.

Accordingly, we determine that the trial court did not abuse its discretion by excluding the evidence. Its determination that the probative value of the evidence was substantially outweighed by its potential for prejudice does not " ' "exceed[] the bounds of reason, all the circumstances being considered." ' " (*People v. Vargas* (2001) 91 Cal.App.4th 506, 543.)

### 4. *Prejudice*

Assuming, however, that the trial court erred by excluding the evidence under Evidence Code section 352, we find any error not to be prejudicial. As a general rule, "the ' "[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense." [Citations.]' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 998.) "Although the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense evidence on a minor or subsidiary point does not interfere with that constitutional right." (*Id.* at p. 999.) When a trial court's rulings have precluded a defendant from presenting a defense in violation of the federal constitution, we apply the harmless-beyond-a-reasonable-doubt standard articulated in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (See, e.g., *People v. Aranda* (2012) 55 Cal.4th 342, 363 [federal constitutional errors subject to review for harmlessness under *Chapman*].)[11]

---

[11] A violation of the confrontation clause would trigger the application of the *Chapman* standard, but, as we have determined *ante*, Duangputra has not in fact presented a confrontation clause claim. (See *People v. Garcia* (2020) 46 Cal.App.5th 123, 178-179 [violations of the confrontation clause reviewed for harmless error under *Chapman*].)

However, a trial court's ruling does not constitute a violation of federal constitutional rights when it "merely reject[s] certain evidence concerning the defense." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1325.) In this case, the trial court's exclusion of evidence of a financial motive did not preclude Duangputra from presenting a defense that Ar.D. and An.D. were sufficiently biased against him to fabricate their allegations. (See, e.g., *People v. Espinoza* (2002) 95 Cal.App.4th 1287, 1317-1318 [erroneous exclusion that complaining witness lied to foster mother did not preclude defense based on witness's lack of credibility].) The defense's theory was that Ar.D. and An.D. fabricated their allegations based on jealousy stemming from a combination of their parents' neglect and L.P.'s affection for Duangputra, who L.P. considered her son. And as defense counsel argued, "the jealousy and the money go hand in hand." Thus, excluding evidence of a financial motive did not completely preclude Duangputra from presenting his defense.[12] We accordingly apply the standard of harmless error under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*Bradford*, *supra*, at p. 1325.) To establish prejudicial error under *Watson*, Duangputra must show that it is reasonably probable that he would have received a more favorable result absent the error. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

Here, there was no concrete evidence that Ar.D. and An.D. stood to financially gain from fabricating their allegations against Duangputra. Rather, the only rational inference from the proffered testimony that supports Duangputra's claim is that Ar.D. and An.D. *might* have stood to gain some unspecified portion of whatever sale proceeds L.P. would have given to Duangputra, which L.P. could elect to give to other relatives.

---

[12] Indeed, An.D.'s testimony about the impairment of his relationship with his mother and other relatives, together with L.P.'s flat if inconsistent denial that she ever left him in Duangputra's care, was suggestive of the strength of L.P.'s attachment to the nephew she considered a son.

22

Based on the tenuous nature of this claim, we find it has little probative value as to the credibility of either An.D. or Ar.D. Furthermore, this is not a case where the evidence of guilt was slight. Ar.D. and An.D. each largely corroborated the other's accounts of the abuse, describing similar incidents. An.D. recounted that he told his wife about Duangputra's abuse in 2011 or 2012, a fact that she attested to at trial when she recalled that An.D. disclosed his abuse to her before their marriage in 2011. P.P. also recalled that An.D. disclosed to abuse to him shortly after their father S.P. passed away. We acknowledge that there were discrepancies in An.D. and Ar.D.'s accounts as to who lived in the San Jose house and how frequently they saw their parents, and L.P. and S.C. provided contrary testimony denying that An.D. and Ar.D. were left alone with Duangputra. Yet An.D. and Ar.D. were testifying in 2020 about events that transpired between 1989 and 1991—and any discrepancy may have been logically attributed to fading memories and the passage of time, as opposed to falsity.

Duangputra argues otherwise, contending that the prosecutor repeatedly argued that An.D. and Ar.D. had no motive to lie, exploiting the trial court's erroneous exclusion of evidence. Although a prosecutor is generally given wide latitude during argument, "[d]ue process . . . bars a prosecutor's knowing presentation of false or misleading argument." (*People v. Morrison* (2004) 34 Cal.4th 698, 717.) A prosecutor "may not mislead a jury," including by asking "the jurors to draw an inference that they might not have drawn if they had heard . . . evidence the judge had excluded." (*People v. Daggett* (1990) 225 Cal.App.3d 751, 758; see *United States v. Blueford* (9th Cir. 2002) 312 F.3d 962, 968 ["it is decidedly improper for the government to propound inferences that it knows to be false, or has very strong reason to doubt"].) Yet the prosecutor's argument—that An.D. and Ar.D. had nothing to gain from testifying at trial—was based on inferences from the evidence. And here, this is not a case where there was any other definitive evidence, aside from the inferences that could be drawn from L.P.'s testimony

at the 402 hearing, that strongly suggested that An.D. and Ar.D. stood to financially gain from Duangputra's incarceration.

Duangputra nonetheless argues any error was prejudicial because this was a close case, as his convictions resulted from his *second* trial on the same charges—the first trial resulted in a mistrial. The first jury, however, did not reach the merits of the brothers' allegations against Duangputra, as they did not deliberate past the factual findings required to determine whether the statute of limitations had been tolled under section 803, subdivision (f).[13] Although a prior jury deadlock may be relevant in assessing any prejudicial impact of error, it is also "difficult to read into significance" the fact that the jury could not reach a consensus on an identified narrow issue—"[j]uries fail to agree for a variety of reasons and the rules of evidence prohibit inquiry into the jurors' subjective reasoning process." (*In re Richards* (2016) 63 Cal.4th 291, 316 (conc. opn. of Corrigan, J.).)

Accordingly, we conclude that the exclusion of the evidence under Evidence Code section 352 was harmless as it is not reasonably probable that Duangputra would have received a more favorable outcome had L.P.'s testimony been admitted at trial. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

---

[13] The court in the first trial instructed the jury as follows: "Before you may find the defendant guilty of counts 1 through 6 or any of the lesser crimes, you must all agree that for each of those crimes the People have proved the following factual allegations: [¶] (1) On May 3rd, 2016, [An.D.] reported the crime to California law enforcement. . . . [¶] (2) On June 21st, 2016, a complaint was filed; (3) [An.D.] was born on or after [date redacted]; [¶] (4) The crimes involved substantial sexual conduct; and [¶] (5) Independent evidence corroborating [An.D.'s] allegation, to wit, [Ar.D.'s] testimony of observing [An.D.] with semen on his hands." The jury foreperson from the first trial informed the trial court that "[m]ost of the hang up" was on the fifth factual finding, the existence of independent evidence corroborating An.D.'s claims.

**B. CALCRIM No. 1193**

Duangputra next argues that the trial court erred by instructing the jury with CALCRIM No. 1193, which informs the jury that it can use CSAAS evidence to evaluate the complaining witnesses' "believability." Duangputra argues that the instruction as given essentially permitted the jury to consider expert testimony as supportive of the truth of the allegations against him, lessening the prosecutor's burden of proof.[14] Although we agree that CALCRIM No. 1193 could be clarified, we conclude that it is not reasonably likely the jury would have misapplied the instruction on this record.

"We review a claim of instructional error de novo. [Citation.] The challenged instruction is considered 'in the context of the instructions as a whole and the trial record to determine whether there is reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Rivera* (2019) 7 Cal.5th 309, 326 (*Rivera*).) " 'Moreover, any theoretical possibility of confusion [may be] diminished by the parties' closing arguments.' " (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220, abrogated on a different ground as stated in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

CSAAS expert testimony is inadmissible to prove that a complaining witness has in fact been sexually abused. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300.) It is admissible solely to rehabilitate a complaining witness against a suggestion that the witness's conduct after the abuse was inconsistent with having been abused. (*Ibid.*) Thus, the expert testimony may legitimately serve " 'to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain . . . abused children's seemingly self-impeaching behavior." (*Id.* at p. 1301.)

---

[14] Duangputra made no objection when the trial court instructed the jury with CALCRIM No. 1193, but we nonetheless reach the merits of his claims because he contends that the instruction was an incorrect statement of law and affected his substantial rights. (§ 1259; see *People v. Grandberry* (2019) 35 Cal.App.5th 599, 604.)

25

In this case, the jury was instructed on the limited purpose of CSAAS evidence as follows: "You have heard testimony from Dr. Blake Carmichael regarding Child Sexual Abuse Accommodation Syndrome. [¶] Dr. Blake Carmichael's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [An.D.'s] and/or [Ar.D.'s] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of his testimony."

Multiple Courts of Appeal have upheld the language of CALCRIM No. 1193, as recited above, as accurately informing the jury of the limited use of CSAAS evidence. (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 503-504 (*Gonzales*); *People v. Munch* (2020) 52 Cal.App.5th 464, 473-474; *People v. Lapenias* (2021) 67 Cal.App.5th 162, 175-176.) Duangputra recognizes these cases but argues that they overlooked the fact that by permitting jurors to use CSAAS testimony to evaluate the complaining witnesses' "believability"—or credibility—the instruction effectively circumvents the prohibition against permitting CSAAS testimony to prove a defendant's guilt.

We acknowledge that the inclusion of "and" in the last sentence of the instruction is susceptible of an interpretation that the jury's use of CSAAS evidence in evaluating "the believability of [the witnesses'] testimony" might extend beyond merely deciding whether the witnesses' conduct was inconsistent with that of someone who had been molested. But we consider it unlikely on this record that the jury would have applied the instruction in an impermissible manner. (*Rivera*, *supra*, 7 Cal.5th 309, 326.) CALCRIM No. 1193 expressly informs the jury that CSAAS evidence "is not evidence that the defendant committed any of the crimes charged." Carmichael's testimony was appropriately limited: he did not render an opinion as to whether the victims were in fact molested.

Thus, we find no merit in Duangputra's assertion that the reference to the "believability" of the witnesses in CALCRIM No. 1193 would have led the jury to

26

believe that it was free to use the CSAAS evidence as a diagnostic tool—to extrapolate from the witnesses' childhood behavior that Duangputra had abused them—rather than a rehabilitative tool permitting the jury to intelligently decide whether their behavior was *self*-impeaching. For these same reasons, we find no merit in Duangputra's claim that the instruction impermissibly lowered the prosecutor's burden of proof. (*Gonzales*, *supra*, 16 Cal.App.5th at p. 504.)

## C. *Cumulative Error*

Duangputra argues that the cumulative effect of all the alleged errors requires reversal of the judgment. "In theory, the aggregate prejudice from several different errors occurring at trial could require reversal even if no single error was prejudicial by itself." (*In re Reno* (2012) 55 Cal.4th 428, 483.) We have assumed error from the trial court's exclusion of evidence that An.D. and Ar.D. may have been financially motivated but found that error not to be prejudicial. We find no error with the trial court's instruction with CALCRIM No. 1193. As there are no other errors to cumulate, we must reject Duangputra's claim of cumulative error.

## D. *Consecutive Sentences under Section 667.6*

Duangputra argues that the trial court's imposition of full-term consecutive sentences under section 667, subdivision (d), which mandates such sentences for specified sex offenses if the trial court makes certain factual findings, violates the Sixth Amendment right to a jury trial.[15] While Duangputra's appeal was pending, the California Supreme Court foreclosed this argument by its decision in *People v. Catarino* (2023) 14 Cal.5th 748 (*Catarino*). In his reply brief, Duangputra concedes that this court is bound by *Catarino* but maintains his argument to preserve his avenues for collateral

---

[15] At sentencing, the trial court made the requisite factual finding that the offenses at issue occurred on "separate occasions" within the meaning of section 667.6, subdivision (d)(1), mandating full-term consecutive sentences.

review of his federal constitutional claim. (Compare *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 (*Apprendi*) [holding that Sixth Amendment requires that, "[o]ther than the fact of a prior conviction, any fact that increase the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt"] with *Oregon v. Ice* (2009) 555 U.S. 160, 163 [holding that *Apprendi* does not apply to a trial court's nonjury sentencing function of determining "any fact declared necessary to the imposition of consecutive, in lieu of concurrent, sentences"].)

Following *Catarino* and its conclusion that section 667.6, subdivision (d) did not "define or alter the term for any particular offense in a manner that invades the historical province of the jury" (*Catarino*, *supra*, 14 Cal.5th at p. 756), we reject Duangputra's claim that imposition of full-term consecutive sentences for his convictions violates his Sixth Amendment rights under *Apprendi*. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

### E.    *Retroactivity of Assembly Bill No. 124*

Duangputra argues that in light of recent legislative changes to section 1170, he is entitled to a remand for resentencing so that the trial court can properly consider his youth at the time he committed the offenses. We agree.

At the sentencing hearing, Duangputra raised his youth as a mitigating factor, arguing that he was "between 22 and 24 years old" when he committed the crimes and that based on current scientific studies, the brain continues to develop until a person reaches his or her "middle 20s." In response, the trial court noted that, whether or not Duangputra's arguments about brain development were true, this factor was "not currently a mitigator under the Rules of Court." The trial court then went on to state that, of the aggravators and mitigators it found to be present, "there are probably more aggravators, but the defendant did not have a significant criminal history. He did violate a position of trust. He committed multiple, serious, sexual offenses, but the Court is of

28

the opinion that the factors in aggravation and those in mitigation offset, and therefore, the Court has selected the middle term of the imprisonment for each offense."

As recently amended, section 1170, subdivision (b)(6) now provides: "[U]nless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] . . . [¶] (B) The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense." (Stats. 2021, ch. 695, §§ 5.3, 6 [Assembly Bill No. 124, eff. Jan. 1, 2022].) Section 1016.7, subdivision (b), states: "A 'youth' for the purposes of this section includes any person under 26 years of age on the date the offense was committed." (Stats. 2021, ch. 695, § 4.)

The Attorney General concedes that the recent legislative change to section 1170, subdivision (b)(6) applies retroactively to nonfinal judgments (see *People v. Flores* (2022) 73 Cal.App.5th 1032, 1038-1039 (*Flores*); *People v. Banner* (2022) 77 Cal.App.5th 226, 240 (*Banner*); *In re Estrada* (1965) 63 Cal.2d 740) but argues that remand is not required because the trial court would not have imposed the lower term in this case.

Where a sentencing court was unaware of the scope of its sentencing discretion under later-enacted law, "the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391 (*Gutierrez*) [remand required after California Supreme Court eliminated presumption of life without the possibility of parole for juveniles convicted of special circumstance murder]; *People v. McDaniels* (2018) 22 Cal.App.5th 420, 428 [remand required to determine whether trial court would exercise its newly established discretion to strike a firearm enhancement following legislative amendment].)

29

Applying *Gutierrez*, we conclude that the record does not clearly indicate that the trial court would have reached the same conclusion had section 1170, subdivision (b)(6) been in effect at the time of the sentencing hearing. Rather, the record indicates that the trial court found that the factors in aggravation and those in mitigation to be in equipoise—without consideration of the very arguments about young adult brain development that have informed recent legislative developments. (Cf. *People v. Acosta* (2021) 60 Cal.App.5th 769, 780 [noting Legislature's express recognition in amending § 3051, providing youth offender parole hearings, "that cognitive brain development continues into the early 20s or later, and the parts of the brain that are still developing during this process affect judgment in ways that are highly relevant to criminal behavior"].) Although Duangputra specifically argued that his youth at the time of the offenses was a mitigating factor, the trial court expressly chose not to consider it under then-current law.[16] And section 1170, subdivision (b)(6) now establishes a *presumption* of a lower term if its provisions apply. (See *Flores*, *supra*, 73 Cal.App.5th at p. 1039; *Banner*, *supra*, 77 Cal.App.5th at p. 241.) Before the trial court can deviate from this presumption, it is now required to find that the aggravating circumstances *outweigh* the mitigating circumstances such that the lower term would be contrary to the interest of justice. (§ 1170, subd. (b)(6).) In this case, the trial court's stated reasoning leaves open the possibility that reassessing the aggravating and mitigating circumstances under current law might lead to a different conclusion on remand.

The Attorney General argues that remand is not required because nothing in the record indicates that Duangputra's youth was a contributing factor in the commission of the offenses. But neither Duangputra nor the trial court had a "meaningful incentive" to

---

[16] Whether the defendant is under 26 years of age or was under 26 years of age at the time of the offense has since been added as a mitigating factor to be considered under California Rules of Court, rule 4.423(b)(6), as amended May 14, 2022.

assess whether youth was a contributing factor in the commission of the offenses at the time of the sentencing hearing, which predated the amendments made to section 1170. (*Banner*, *supra*, 77 Cal.App.5th at p. 242.)

Based on the foregoing, we conclude that it is appropriate to remand the matter for resentencing, as it is unclear whether the trial court would have imposed the same sentence under the current law. (See *Gutierrez*, *supra*, 58 Cal.4th at p. 1391.) We express no opinion as to whether the trial court, on remand, should in fact find that Duangputra's youth was a "contributing factor" to the commission of the offenses. (§ 1170, subd. (b)(6).) We also do not express an opinion as to what the appropriate sentence should be. These are issues that the trial court may resolve or clarify in the first instance in the exercise of its informed discretion under the new law.[17]

## F.    *Fines and Fees*

At the sentencing hearing defense counsel objected to the imposition of fines and fees under *People v. Dueñas* (2019) 30 Cal.App.5th 1157.[18] In response, the trial court indicated that it "intended to stay fines and fees," though it intended to nonetheless impose a "$200 restitution fund fine" and a "$100 fine based on the date of offense" for

---

[17] After briefing in this case was completed, the Attorney General submitted two letters informing us that there was new authority on the issue of whether failing to consider Duangputra's youth as a mitigating factor was harmless error. Neither of the cases cited by the Attorney General are applicable as they are both procedurally and factually distinguishable. (See *People v. Oliver* (2023) 90 Cal.App.5th 466, 488-489 [analyzing whether it was harmless error when trial court failed to consider youthful age in its reckless-indifference and major-participant findings when denying a section 1172.6 petition for resentencing]; *People v. Frederickson* (2023) 90 Cal.App.5th 984, 987 [rejecting claim that trial court is required to make express findings under section 1170, subdivision (b)(6) at a sentencing hearing that post-dated the effective date of Assembly Bill No. 124].)

[18] This issue is currently pending review by the California Supreme Court in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844.

count 9.  The trial court subsequently imposed various fines and fees, including a $200 restitution fine (former § 1202.4, subd. (b)), a $100 fine pursuant to section 290.3, and a $259.50 criminal justice administration fee (Government Code, §§ 29550, 29550.1, 29550.2).  On appeal, Duangputra argues that these fines and fees must be stayed absent a determination that he has the ability to pay them.

Based on the colloquy at the sentencing hearing, it is unclear whether the trial court merely neglected to orally stay the fines and fees that were imposed in this case, as it stated was its intent at the outset of the hearing.  Regardless, we need not address Duangputra's claim of error on this record.  As we are reversing and remanding the matter for resentencing under section 1170, Duangputra can raise his claims regarding fines and fees in the trial court in the first instance.

### III.    DISPOSITION

The judgment is reversed, and the matter is remanded for resentencing under section 1170, subdivision (b)(6), as enacted by Assembly Bill No. 124.

_____

LIE, J.

WE CONCUR:

_____

GREENWOOD, P.J.

_____

GROVER, J.

*People v. Duangputra*
H048637